CHARLES S. ADAMS, AS ADMINISTRATOR DE BONIS NON CUM TESTAMENTO ANNEXO OF THE ESTATE OF JOHN S. ADAMS, DECEASED, APPELLANT, VS. BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT FUND, APPELLEE.

WITNESS—WHEN DISQUALIFIED FROM INTEREST IN EVENT OF SUIT—EVIDENCE—REFRESHING MEMORY FROM MEMORANDA—WHEN ASSETS ARE ADMINISTERED BEYOND THE REACH OF SUCCEEDING ADMINISTRATORS—POSSESSION AS PROOF OF OWNERSHIP OF PERSONALTY.

1. Section 24, p. 518, McClellan's Digest, brought forward as section 1095 of the Revised Statutes, was originally adopted here from the civil code of the State of New York. Its purpose was to enlarge—not to restrict—the competency of witnesses.

The expression "interest in the event," as used in the proviso to this statute, was never intended to enlarge the class to be excluded under it beyond that which the common law excluded in using the same language. Under the stringent rules of the common law *all* persons who were interested in the event of a suit were disqualified from testifying therein, whether their antagonists in interest were living or dead. The purpose of this statute was to remove this common-law disability arising from *interest in the event* of litigation, except in cases where one of the parties to any "transaction or communication" was, at the time of the examination, dead or insane. In the latter cases the disabilities arising from *interest in the event* that were imposed by the common law are, by this statute, retained. But in such cases the statute disqualifies *those only* who were disqualified by the general rule of the common law. Any exception from the disqualification that was recognized by the rules of the common law, forms a like exception to the cases intended to be excluded by the proviso to this statute. If the witness was competent by the common law, he is competent also under the proviso to this statute, and *vice versa.*

2. The true test of the interest of a witness under the proviso to this statute is whether he will either gain or lose by the direct legal operation and effect of the judgment, or whether the record in the case will be legal evidence, for or against him, in some other action. It must be a present, certain and vested interest, and not an interest uncertain, remote or contingent.

3. By the common law agents, carriers, factors and other servants of this description constituted a class of special exceptions to the general rule that a witness interested in the subject of the suit is not competent to testify on the side of his interest. This principle was extended to every species of agency or intervention by which business was transacted, unless the case was overborne by some other rule that took the agent out of the exception. Such agents as were not disqualified to testify at the common law, are likewise not disqualified under the proviso to this statute.

4. An interest by the witness simply in the *question* involved does not disqualify him under the proviso of our statute, but, to disqualify him, he must be so interested in the *result* of the

suit as that he would gain or lose directly and immediately thereby, or that the record therein could be used as legal evidence either for him or against him in some other suit as an establishment or disestablishment of the matters testified about by him.

5. Witnesses are not only permitted to refresh and assist their memory by the use of written instruments, memoranda or entries in books made contemporaneously with the transactions to which they relate, but, if the writing is present in court, they may be *compelled* to do so.

6. The possession of personal property raises the presumption of title in, and ownership of, the property by the possessor; but this presumption arises only when the *character* of the possession is unexplained; when the possession and nothing more is shown. It is the lowest species of evidence, and liable to be overcome by any evidence showing the character of the possession, and that it is not necessarily as owner, or that it is equally consistent with an outstanding ownership in a third person, as with a title in the possessor.

7. The word "administer," when applied to the disposition of the assets of a decedant's estate, is equivalent to "alter," "change," or "convert." The change or alteration of the goods necessary to amount to an *administration* of them by one administrator, so that they would be beyond the reach and control of the succeeding administrator *de bonis non*, is not a change *in specie*, but a change *in the property of the goods*.

Appeal from the Circuit Court for Leon county.

The facts in the case are stated in the opinion of the court.

*R. W. Williams* and *A. W. Cockrell & Son*, for Appellant.

*Cooper & Cooper*, for Appellees.

TAYLOR, J.:

On July 23d, 1890, the appellant, as administrator *de bonis non cum testamento annexo* of the estate of John S. Adams, deceased, filed his bill in equity in the Circuit Court for Leon county against the Board of Trustees of the Internal Improvement Fund of Florida, alleging therein, in substance, as follows: That by the act of the Legislature of Florida, approved on the 6th day of January, A. D. 1855, entitled "An act to provide for and encourage a liberal system of internal improvements in this State," certain lands, and the proceeds from sales thereof, were set apart and declared a distinct and separate fund to be called the Internal Improvement Fund of the State of Florida, and to be strictly applied according to the provisions of said act. That for the purposes of assuring such application, said lands and all funds arising from the sale thereof were irrevocably vested in five trustees, *viz:* The Governor of this State, the Comptroller of Public Accounts, the State Treasurer, the Attorney General and the Register of State Lands, the last named, by a constitutional amendment, being now called the Commissioner of Agriculture. That certain lines of railroads were designated in said act as proper improvements to be aided by said Internal Improvement Fund. That said railroads upon the completion of certain designated portions of their works were authorized to issue coupon-bonds having not more than thirty-five years to run, and drawing not more than seven per cent annual interest, payable semi-annually in the City of New York or Tallahassee, at the rate of eight thousand dollars per mile for the purchase and delivery of the iron rail, etc., for

said roads; and, after said rails had been laid, the additional sum of two thousand dollars per mile for the purchase of necessary equipments for said roads. That it was made the duty of said railroad companies, the Comptroller of Public Accounts, and the State Treasurer, to perfect said bonds and secure the payment of the coupons or interest on the same, thus making them saleable in the markets. That among the said railroads that accepted the provisions of said act and became entitled to the privileges therein granted were the Florida Railroad Company, the Florida, Atlantic and Gulf Central Railroad Company, the Pensacola and Georgia Railroad Company, and the Tallahassee Railroad Company, who, under the provisions of this act, issued a large number of coupon–bonds that were recorded by the Comptroller of Public Accounts, and the record thereof certified on each bond; each of which bonds was dated the first day of March, A. D. 1856, and conditioned for the payment of $1,000, and less amounts, on the first day of March, A. D. 1891, in the city of New York, with interest thereon at the rate of seven per cent per annum, payable semi-annually, which semi-annual interest was represented by coupons attached to said bonds and payable to bearer. That your orator's testator, John S. Adams, died in the city of Jacksonville, Duval county, Florida, on the 23rd day of April, A. D. 1876, having previously made his last will and testament, wherein he named and constituted Ellen F. Adams, his surviving widow, executrix thereof. That said will was duly probated in Duval county, and said executrix qualified as such and entered into possession of all the property, real and personal. The said executrix died on the 6th

of June, A. D. 1878, without having completed the the administration. That on the 30th day of July, 1878, one John S. Driggs, of said Duval county, was duly appointed administrator *de bonis non cum testamento annexo*, and duly qualified as such, taking possession of all the property, real and personal, of the deceased. That afterwards, on the 5th day of June, 1885, the said John S. Driggs, on appropriate proceedings had in the probate court that appointed him, was removed from his office as such administrator, and thereafter, on the 6th day of June, A. D. 1885, your orator was duly appointed administrator *de bonis non cum testamento annexo* of said estate, and duly qualified as such, and is now acting as such administrator. That the said testator, the said John S. Adams, died the holder and owner of a large number of said coupons, to-wit: 62 coupons of the Florida Railroad Company, aggregating in value $2,170; 118 of the Florida, Atlantic and Gulf Central Railroad Company, aggregating $4,130; 103 of the Pensacola and Georgia Railroad Company, aggregating $1,816.50; and 454 of the Tallahassee Railroad Company, aggregating $5,194. That each of said coupons is for the semi-annual interest upon the bond to which it was attached, and each of said coupons has long since matured, and the interest on the same become due. That the total number of said coupons is 737, and the aggregate amount thereof is the sum of $13,310.50, with interest upon each coupon from the date of the maturity thereof. That your orator is unable to describe more minutely the said coupons for the reason that on the 26th day of May, A. D. 1879, the aforesaid John S. Driggs, at that time the administrator of the said estate, deposited said cou-

pons with one Walter Gwynn, at that time Treasurer
for the Trustees of the Internal Improvement Fund,
as more fully appears by the receipts therefor of the
said Gwynn to the said Driggs, copies of which are
attached to the bill marked exhibits A, B, C, D, E,
and F.    That said Gwynn deposited the said coupons
with the Trustees of the Internal Improvement Fund
upon his retiring from office, as your orator is in-
formed and believes.    That by the provisions of said
legislative act certain lands therein specified, and the
proceeds arising from the sale thereof were set apart
as a distinct and separate fund to be held and used
by the said Trustees for the purpose of paying cer-
tain indebtedness therein provided for, to-wit: the
coupons representing interest upon certain railroad
bonds.    That these coupons herein sued upon are a
part of the identical indebtedness for the payment of
which the fund was created, the lands and proceeds
thereof set apart and these trustees named.    That
by virtue of said act the said trustees have from time
to time received considerable sums of money from the
sales of said lands and otherwise, which moneys were
especially set apart to pay the coupons from the rail-
road bonds of which the coupons herein sued for are
a part, and said moneys come into possession of the
trustees as a special trust fund to be used in the pay-
ment of these coupons.    That the said railroad com-
panies failing to provide the interest on the bonds
issued by them as aforesaid, and failing otherwise to
comply with the provisions of the said act, the said
trustees took into their possession the said railroads
and all the property thereof and sold the same.    That
your orator, as such administrator, has applied to the
said trustees to pay him the amount due upon said cou-

pons, or deliver said coupons to him, but they absolutely refuse and fail to comply with such request and demand, pretending that said coupons are the property of the Trustees of the Internal Improvement Fund, whereas your orator charges that said coupons are of the estate of John S. Adams, deceased, subject to administration, and that neither the said John S. Adams during his lifetime, nor any one for him, nor for his estate since his decease, has been paid any part of the amount due upon said coupons, but that the whole amount with interest from the maturity of each coupon is unpaid and is due to your orator as administrator aforesaid.

The bill prays that the trust created by the said act of the Legislature may be enforced, and that the said trustees may be required by the order and decree of this court to produce in this court the coupons hereinbefore named, and to pay to orator the amount, including interest that is due upon said coupons. There is also a prayer for general relief.

The defendant Board of Trustees answered, admitting the allegations of the bill as to the purpose and scope of the act of the Legislature of 1855, creating the Board of Trustees of the Internal Improvement Fund. It admits the death of John S. Adams and the appointment and qualification of administrators of his estate as alleged in the bill. It denies that John S. Adams died the holder and owner of the coupons alleged in the bill, or any of them; but, on the contrary, alleges that all of said coupons alleged in the bill to have been in possession of said John S. Adams belonged, when in said Adams' possession, and at all times since, to the said fund and the trustees thereof,

and that said Adams never had possession of said coupons, or any of them, otherwise than as the agent of the trustees of said fund, and for them. That said John S. Adams in his life time, to-wit: From February 4th, 1869, until February 5th, 1873, was one of the trustees of said fund, and acted at divers times as agent of the then trustees of said fund to receive such coupons as alleged in complainant's bill for said trustees and said fund, on payment and taking up of such coupons by said fund, or payment of such coupons into such fund on payment by purchasers of lands of said fund with such coupons, and such coupons previously so paid or received by said fund and held as vouchers belonging to said fund and the trustees thereof. That said John S. Adams was for a long time, to-wit: From May 15th, 1871, until February 5th, 1873, the agent of the then trustees of said fund for the sale of the lands thereof, and did receive many such coupons as described in complainant's bill as such agent in payment for lands of said fund, and for the use and benefit of said fund, and as the property of said fund and the trustees thereof. That previous to the time of the death of the said John S. Adams, to-wit: In October, A. D. 1870, said John S. Adams being then secretary of the Board of said Trustees, was duly authorized by said Board as the agent thereof to settle the accounts of Hugh A. Corley, who had been from June, 1867, until July, 1868, the acting treasurer of the said Board of Trustees, and such settlement was made by said Corley with said Adams as such agent of said trustees. That in the settlement so made said John S. Adams as such agent received from said Corley for said Board many coupons that had been paid or satisfied and·taken up by said Corley for said trus-

tees, while acting as treasurer of said Board, and that were held by the said Corley as vouchers in the premises. That said John S. Adams never accounted to said Board of Trustees for the coupons received by him as agent of said Board from said Corley for and as the property of said Board, but they simply remained in the possession of said John S. Adams as the property of said Board of Trustees and said fund, he having received them as agent of said Board as aforesaid; and said John S. Adams never had or claimed in any way, or in any way set up any personal right, title, interest or possession of, in or to said coupons, or any of them, or otherwise than as agent of said Board of Trustees as aforesaid. These defendants were not trustees of said fund during the times and transactions aforesaid, but they are informed and believe, and so allege, that said John S. Adams received the coupons for which, and principal and interest of which, complainant sues in his bill, only as the agent of said Board of Trustees and for said trustees, and as the property of said trust fund, either as the salesman of said Board in payment of lands of said fund, or as agent of said Board to make said settlement with said Corley, or as secretary of said Board, or otherwise as agent of said Board; and defendants, on information and belief, deny that said John S. Adams ever owned, or possessed, otherwise than as the agent of said Board of Trustees, and for the said Board and trust fund, said coupons for which, and principal and interest for which, complainant sues in his said bill. Strict proof of all the allegations of the bill as to John S. Adams' possession and ownership of said coupons is demanded by the answer. The answer further admits that one of the trusts for and on which the lands of said trust

fund were vested in such trustees was to pay the interest represented by coupons on certain railroad bonds, such as described in the bill, on default of the several railroad companies to pay the same, as provided in said Internal Improvement Act, but allege that such was not the sole trust; that by said act and subsequent legislation said lands are held by said trustees in trust also to procure the drainage, reclamation and settlement of the swamp or overflowed lands, and all said lands and proceeds thereof to pay expenses of administering the trust, and for settlement and cultivation, and to encourage and aid works of internal improvement other than those mentioned in complainant's bill, and the proceeds of internal improvement lands proper for the payment of certain bonded indebtednesses of certain counties and cities, and to protect the residuary interest of the State in all said lands and the proceeds thereof. And defendants aver that the claims and demands and relief prayed by complainant are adverse to the trusts on and for which defendants hold such lands and proceeds thereof, and defendants show that the coupons sued on by the complainant in his bill, and every of them, became due and payable, if at all, more than twenty years before the commencement of this suit, and defendants are advised that the claim and suit of complainant herein are barred by the statute of limitation in such case provided, and defendants pray as full benefit of such defense as though they had made the same by plea. Defendants further allege, on information and belief that John S. Adams in his life time never made any claim or demand on said trustees for payment of said coupons, nor did his executrix ever make such claim or demand, nor did his administrator John S. Driggs

ever make such claim or demand until April, A. D. 1889, and defendants aver that by reason of laches of said John S. Adams, his executrix and several administrators in the premises, complainant is barred of any relief in the premises in a court of equity. Defendants further allege, on information and belief, that said John S. Driggs, as administrator *de bonis non* of the estate of John S. Adams, deceased, did, on the 26th day of May, A. D. 1879, deliver to Walter Gwynn, then treasurer of the Board of Trustees of said fund, as such treasurer, for said trustees, and as the property of said fund, the coupons by the complainant in his bill sued for, and mentioned in the receipts of said Gwynn as such treasurer to said Driggs, administrator, of which the exhibits attached to the bill, defendants believe, are true copies; and said matters of said coupons concerning which said bill is exhibited by said complainant as thereby fully and finally settled, adjusted and satisfied by and between the trustees of said fund and said Driggs, as administrator of the estate of said Adams; and defendants are informed, advised, believe and allege that said coupons are not and none of them are, of the estate of said Adams, deceased, subject to administration, and that complainant is not entitled to said coupons or any of them, or principal, or interest of or on them, or any of them, and they further deny that said coupons, or any of them, or interest on them, or any of them, is unpaid.

A general replication was filed by the complainant, the cause was referred to a master to take and report testimony, and a voluminous amount of testimony, both oral and documentary, was taken and reported to the court. A final hearing was had upon the plead-

ings and proofs that resulted in a final decree, on January 8th, 1892, denying the relief prayed and dismissing the bill. From this decree the appellant, complainant below, appeals.

The assignments of error are as follows: 1. Excluding as evidence and suppressing the entries in the minute-book of the Trustees of the Internal Improvement Fund of April 3d, 1872, page 543, and May 7th, 1872, page 546. 2. Overruling the objection to and admitting as evidence the testimony of Hugh A. Corley. 3. Overruling the objection to the witness H. A. Corley, testifying from a written memorandum. 4. Admitting the letter marked "Exhibit A" in evidence over objection. 5. Admission of evidence of the account marked "Exhibit B," over objection. 6. Admitting as evidence the salesman's stub-book from April 1st, 1871, to February 5th, 1873, and entries in register of entries of swamp lands from January 3d, 1871, to February 5th, 1873, and entries in register of entries of internal improvement lands from January 2d, 1871, to December 2d, 1872. 7. Ordering that the bill of complaint be dismissed, and that the plaintiff pay the costs of suit. 8. That the decree of the court on the 8th day of January, 1892, is erroneous as to the matters and things passed upon by said court in paragraphs respectively numeberd 1, 2, 3, 5, 6, 9, 10, 11, 12, 13, 14, and 15 of said decree, and each and every of said paragraphs. 9. That the order or decree made on January 20th, 1892, denying the complainant's petition for a rehearing of the cause is also erroneous.

In order to amplify and make clearer the assignments of error embraced in paragraph eight (8) above, we here give the decree of the court of January 8th,

Adams, Admr., v. Board of Trustees I. I. Fund.—Opinion of Court.

1892, as follows: "This cause came on to be heard, and was argued by counsel for the plaintiff and defendants respectively, and upon consideration thereof it is ordered, adjudged and decreed as follows: 1. The defendants' objection to the admission in evidence of the statements made by Judge Aristides Doggett to the witness Charles S. Adams are hereby sustained, and said statements are hereby excluded as evidence and suppressed. 2. The defendants' objection to the admission in evidence of the affidavit made by Judge Aristides Doggett, and filed as "Exhibit H," is hereby sustained, and said affidavit is hereby excluded as evidence and suppressed. 3. The defendants' objection to the admission in evidence of the statements made by the witness Charles S. Adams from recollection of the matters appearing in the records of the Trustees of the Internal Improvement Fund are hereby sustained and said statements are hereby excluded as evidence and suppressed. 4. The defendants' objection to the admission in evidence of the extract from the minutes of the Trustees of the Internal Improvement Fund of January 17th, A. D. 1872, page 521, and March 7th, 1872, page 529, and April 2d, 1872, page 541, and June 20th, 1872, pages 550 and 551 of their minute-book, are hereby overruled, and said minutes are hereby admitted and considered as evidence. 5. The defendants' objection to the admission in evidence of the extracts from the minutes of the Internal Improvement Fund of April 3d, 1872, page 543, and May 7th, 1872, page 546 of their minute-book, be and the same are hereby sustained, and the said minutes are hereby excluded as evidence and suppressed. 6. The defendants' objection to the following question

propounded by plaintiff to the witness W. M. McIntosh, Jr., *viz:* "Is there anything else in the proceedings of June 20th, 1872, about Mr. Adams?," is hereby sustained, and the witness' answer thereto is hereby excluded as testimony and suppressed. 7. The defendants' objection to the following question propounded by plaintiff to the witness W. M. McIntosh, Jr., *viz:* "Is that book regarded and accepted by the Board of Trustees as a record of the Board of Trustees in their official capacity, as containing the minutes and proceedings of the Board of Trustees at the time shown by the date in this book?," are hereby overruled. 8. The defendants' objection to the admission in evidence of the report of the Commissioner of Lands and Immigration upon the public lands, appended to the Assembly Journals of the State of Florida for the year 1872, fifth session, marked "Exhibit K," is hereby overruled, and said report is hereby admitted and considered as evidence. 9. The plaintiff's objection to the following question propounded by the defendants to the witness Hugh A. Corley, *viz:* "Did you about October, in the year 1870, have a settlement with the late John S. Adams, he acting for the Board of Trustees of the Internal Improvement Fund, of your account as former acting treasurer of said Board?," are hereby overruled. 10. The plaintiff's objection to the following question propounded by the defendants to the witness Hugh A. Corley, *viz:* "Will you please state whether at that settlement you delivered to Mr. Adams for the Trustees of the Internal Improvement Fund any coupons?; if so, as near as you can, state what coupons, and in what amounts?," are hereby overruled. 11. The plaintiff's objection to the witness Hugh A. Corley

using the account to refresh his memory, is hereby overruled.   12. The plaintiff's objection to the admission in evidence of the letter filed in evidence and marked "Exhibit A," is hereby overruled.   13. The plaintiff's objection to the admission in evidence of the account filed in evidence and marked "Exhibit B," is hereby overruled.   14. The plaintiff's objection to the admission of salesman's stub-book with treasurer's receipts opposite, from April 1st, 1871, No. 7023, to February 5th, 1873, No. 6358, inclusive; and also entries in register of entries of swamp lands from January 3d, 1871, No. 6082, to February 5th, 1873, No. 6358, inclusive; and also entries in register of entries of internal improvement land from January 2d, 1871, No. 6081, to December 2d, 1872, No. 6336, inclusive, is hereby overruled.   15. It is further ordered, adjudged and decreed that the bill of complaint be and the same is hereby dismissed, and that the plaintiff pay the costs of this suit, to be taxed by the clerk of this court."

It will be seen from the specific rulings contained in this decree that the 8th assignment of error based thereon above is practically a reiteration of all the other assignments except the 9th and last one.   In disposing of the case, therefore, we will consider the exceptions in the order in which they are disposed of by the decree appealed from.

The complainant, while testifying as a witness in the cause, stated, in substance, that after he became administrator of the estate of his father, John S. Adams, he came across the receipts given by Walter Gwynn, State Treasurer, to J. S. Driggs, his predecessor in the administration, and thinking they might be of value, he applied to Judge Aristides Doggett,

who he knew had been receiver in the litigation of one Vose against the Trustees of the Internal Improvement Fund, and that he ascertained from Judge Doggett that his father (John S. Adams) had been one of the defendants in that litigation, and under the decree of the United States Court that assumed jurisdiction of it, had made report to Judge Doggett as receiver, and turned over to him a large amount of bonds and coupons received by him in his official capacity. That he obtained from Judge Doggett an affidavit of the facts as stated and attached them to a petition to the Trustees of the Internal Improvement Fund with copies of the receipts, and such information as he could obtain, and made application to the trustees for payment of the coupons. Along with this statement of the witness a copy of the alleged affidavit made by Judge Doggett, that had been taken from a letter-press copy in the possession of the complainant witness, marked "Exhibit H," was offered in evidence by the complainant. These alleged statements of Aristides Doggett to the witness, and the proferred copy of Doggett's affidavit in verification thereof, were objected to by the defendants as being inadmissible and improper evidence of the facts sought to be established thereby, and both objections were sustained by the chancellor in the first and second paragraphs of the final decree, and this ruling is assigned as error. There is no merit in this assignment. The alleged utterances of Aristides Doggett to the witness was patently inadmissible as hearsay, and the affidavit purporting to have been made by Doggett was inadmissible, not only because of its being entirely *ex parte*, but because its contents were sought to be established through the tertiary channel of a

copy of a copy thereof, without any sufficient foundation being laid in the form of proof of loss or destruction of the original, and without any demand being made upon the defendants for the production of the original, it being alleged by the witness that such original was in the possession of the defendants. Had the original affidavit been produced, however, it would have been equally inadmissible as evidence in this suit upon the ground of its being wholly *ex parte.* The ruling of the court was entirely proper in excluding this evidence.

The complainant while testifying as a witness stated that upon the occasion of a visit to Tallahassee he was granted access to the records by the secretary of the Board of Trustees of the Internal Improvement Fund, which he examined for the purpose of satisfying himself as to whether his father John S. Adams had settled his accounts as secretary and treasurer of the Board of Trustees, when the following question was propounded to him: "State the status of your father's official relation as shown in this record shown to you by the trustees." The question was objected to by the defendants, on the ground that the original records or certified transcripts thereof were the proper and best evidence as to what facts were exhibited thereby. The witness, in answer to the question, detailed at length divers facts that he asserted to be shown by the records thus examined by him. All of this testimony was excluded by the chancellor at the final hearing, as is evidenced by the third paragraph of the final decree appealed from, and its exclusion is assigned as error. There was no error in excluding this evidence. The contents of records can not be shown by parol,

where the record itself is extant and accessible. Ex Parte Henry Pitts, 35 Fla. 149.

The two following extracts from the record book of the minutes of the proceedings of the Board of Trustees of the Internal Improvement Fund were offered in evidence by the complainant, and objected to by the defendants as being immaterial and irrelevant, *viz:* "Page 543. Tallahassee, April 3d, 1872. The bond of acting Governor Day, as treasurer of the Trustees, was then presented and approved, and passed over to the charge of the State Treasurer.

A true record—Attest: J. S. Adams, Secretary."

"Page 546. Tallahassee, May 7, 1872. Resolved, that as Samuel T. Day has ceased to be the acting Governor, and so has ceased to be a trustee, therefore his functions as treasurer are terminated, and he is requested to present his account as treasurer, and hand over to his successor all moneys and funds in his hands. Resolved, that Simon B. Conover is hereby appointed to be the treasurer of the Internal Improvement Fund, and is requested to give bond as such treasurer in the sum of twenty thousand dollars.

A true record—Attest: J. S. Adams, Secretary."

The defendants' objection to the introduction of these extracts was sustained by the court and they were excluded by the first paragraph of the final decree appealed from. The second of the above extracts, of date May 7th, 1872, was not at all pertainent or relevant to any issue in the cause, and was very properly excluded. The first of said extracts, of date April 3d, 1872, showing the approval of the bond of S. T. Day, as treasurer of the Board of Trustees, as the successor to John S. Adams in that office was relevant, in that it tended to establish the fact that Samuel T. Day was

on that date (April 3d, 1872) completely qualified as treasurer to take charge of the business of the office and to receive its funds from the hands of Adams, his resigned predecessor. It was particularly pertinent when taken in connection with subsequent extracts introduced in evidence from the same record showing that J. S. Adams, in his accounts as treasurer rendered to the Board of Trustees on June 20th, 1872, claimed credit for a large amount of assets of the office as having been on April 3d, 1872, turned over by him to, and receipted for by, S. T. Day, as his successor, and such extract from the minutes could with propriety have been received and considered in evidence, but its exclusion becomes immaterial and harmless error in view of the fact that other extracts from the same minutes duly admitted and considered by the court abundantly established and recognized the fact that S. T. Day was the official successor of J. S. Adams in the office of treasurer of the Board of Trustees, and that the delivery by Adams to him of the properties of the office as his legitimate successor was duly recognized and authorized by the Board.

W. M. McIntosh, Jr., a witness introduced by the complainant, after testifying that he was now the secretary and treasurer of the Board of Trustees and the custodian of their books and records, and after identifying the record book of the minutes of the Board used in the year 1872, and exhibiting therein the minutes of a meeting of the Board held on June 20th, 1872, was asked the following question by the complainant's counsel: "Is there anything else in the proceedings of June 20th, 1872, about Mr. Adams?" The question was objected to by the defendants on the ground that the record of the minutes was the best evidence as to

what it contained and showed. This objection was sustained by the court at the final hearing—paragraph 6 of the final decree—and the question and its answer—"there is—" were excluded. This ruling is assigned as error. We fail to see the pertinency or materiality of the question propounded, or of the witness' answer thereto, unless it had been followed up with an effort to make an exhibit of the additional matter relating to Mr. Adams that the record book contained. This was not done, however, but the complainant rested content with the attempted establishment of the abstract fact; that the book being testified about by the witness did contain other matter relative to Mr. Adams than what had already been introduced in evidence from said book, without an attempt to offer or show whether or not such additional matter that it did or might exhibit was at all pertinent or relevant to the issues involved in the case. Under these circumstances the question and its answer were utterly immaterial and impertinent, and could not possibly have had any effect in the case, whether retained as evidence or excluded, and no error was committed in their exclusion.

To Hugh A. Corley, a witness on behalf of the defendants, who had testified that he was acting treasurer for the Board of Trustees of the Internal Improvement Fund from about June, 1867, until July 1st, 1868, the defendants propounded the following questions: "Did you about October, in the year 1870, have a settlement with the late John S. Adams, he acting for the Board of Trustees of the Internal Improvement Fund, of your account as former acting treasurer of said Board?" and, "Will you please state whether at that settlement you delivered to Mr.

Adams for the Trustees of the Internal Improvement Fund any coupons; if so, as near as you can, state what coupons, and in what amounts?" These questions were objected to by the complainant for the reason that the witness was personally interested in the matter about which his evidence is sought to be elicited, and in the event of the suit, and that he was disqualified to give testimony as to transactions between himself and J. S. Adams, deceased, but the objections were overruled by the court—paragraphs 9 and 10 of the final decree—to which the complainant excepted, and the rulings are assigned as error. The contention of the appellant in support of this assignment of error, that involves the entire evidence of the witness Hugh A. Corley, is, that it was shown in proof that Corley had failed to account for the funds and assets that came to his hands while acting as secretary and treasurer of the Board of Trustees of the Internal Improvement Fund, and that John S. Adams had been authorized by the Board to call upon him for an accounting, and had called upon him for such accounting, and that in order to relieve and exonerate himself from liability or responsibility, it became and was of material personal interest to Corley to show, if he could, that the trust funds that had come to his hands as such former secretary and treasurer of the Board had been delivered by him to Adams as the authorized agent of the Board. That in the event the defendant Board of Trustees were successful in defeating the attempt of J. S. Adams' administrator to recover such coupons, it would operate as a release to said Corley from any further liability to account therefor to the Board of Trustees. That he was, therefore, personally interested in the event of the suit, and was con-

sequently, disqualified from testifying to any transaction had with J. S. Adams relative thereto, the latter being, at the time of such testimony, deceased. Section 1 of Chapter 1983 laws, approved February 14th, 1874, entitled "an act in relation to testimony in civil actions" (sec. 24, p. 518 McClellan's Digest; sec. 1095 Rev. Stat.) provides as follows: "No person offered as a witness in any court, or before any officer acting judicially, shall be excluded by reason of his interest in the event of the action or proceeding, or because he is a party thereto; provided, however, that no party to such action or proceeding, nor any person interested in the event thereof, nor any person from, through, or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any transaction or communication between such witness and the person at the time of such examination deceased, insane, or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person, or the assignee or committee of such insane person or lunatic; but this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor, or committeeman shall be examined on his own behalf, or as to which the testimony of such deceased person or lunatic shall be given in evidence." This legislation seems to have been adopted *totidem verbis* from the State of New York, it having been originally section 829 of the New York Code of Civil Procedure, but by subsequent revisions of that Code, renumbered as sections 398 and 399 (10th Revised Edition Voorhees' New York An-

notated Code, of 1871). In passing upon this statute this court, in Robinson vs. Dibble's Administrator, 17 Fla. 457, has said that its purpose was to enlarge, not to restrict, the competency of witnesses. Belote vs. O'Brian's Administrator, 20 Fla. 126, In the thoroughly considered opinion, of Judge Peckham, construing this statute, in the case of Misenlord vs. Clum, 126 N. Y. 552, 27 N. E. Rep. 1024, it is said: "The expression, 'interest in the event,' as used in our statute, was never intended to enlarge the class to be excluded under it beyond that which the common law excluded in using the same language." In other words, under the stringent rules of the common law all persons "*interested in the event*" of a suit were excluded from testifying in such suit whether their antagonists in interest were living or dead. The purpose of this statute was to remove this common law disability arising from *interest in the event* of litigation, except in cases where one of the parties to any "transaction or communication" was, at the time of the examination, dead or insane. In the latter cases the disabilities arising from *interest in the event* that were imposed by the common law are, by the statute, retained. But in such cases the statute, disqualifies *those only* who were disqualified by the general rule of the common law. Any exception from the disqualification that was recognized by the rules of the common law would likewise form an exception to the cases intended to be excluded by the proviso to our statute. Where, then, a witness is objected to under the proviso of this statute as being disqualified because of interest in the event of the suit, the true test of his competency is by a resort to the common law.

If he was competent by the common law he is compe-
tent under the proviso to this statute, and *vice versa*.
Darwin vs. Kreigher, 45 Minn. 64, 47 N. W. Rep. 314;
Hanf vs. Northwestern Masonic Aid Ass'n, 76 Wis.
450, 45 N. W. Rep. 315. Under the common law the
*interest*, in order to exclude a witness must have been
some legal, certain and immediate interest, however
minute in the *result* of the cause, or in the *record* as
an instrument of evidence. Where actual gain or loss
would result, simply and immediately from the ver-
dict and judgment, the witness was deemed incompe-
tent by reason of his interest; as, where he was a
party, though but a nominal party, to the suit; or was
a party in beneficial interest; or *quasi* a party, from
having entered into a rule of court or agreement that
another cause, to which he was a party should abide
the same result with that in which he proposed to give
evidence. A witness was also incompetent by the
common law where the record would, if his party suc-
ceeded, be evidence of some matters of fact to entitle
him to a legal advantage, or repel a legal liability. In
Greenleaf on Evidence, sec. 390, it is said that "*the
true test of the interest* of a witness is, that he will
either gain or lose by the direct legal operation and
effect of the judgment, or that the record will be legal
evidence, for or against him, in some other action. It
must be present, certain and vested interest, and not
an interest uncertain, remote, or contingent." In con-
struing the proviso to the statute under consideration
the court of appeals of New York has uniformly ap-
plied the test as thus laid down by Mr. Greenleaf.
Hobart vs. Hobart, 62 N. Y. 80; Wallace vs. Straus,
113 N. Y. 238, 21 N. E. Rep. 66; Connelly vs. O'Con-
nor, 117 N. Y. 91, 22 N. E. Rep. 753; Eisenlord vs.

Clum, 126 N. Y. 552, 27 N. E. Rep. 1024. It is well-settled, however, that by the common law agents, carriers, factors and other servants of this description constituted a class of special exceptions to the general rule that a witness interested in the subject of the suit is not competent to testify on the side of his interest. This principle was extended to every species of agency or intervention by which business was transacted, unless the case was overborne by some other rule that took the agent out of the exception. Croom vs. Noll, 6 Fla. 52; Starkie on Evidence (10th ed.), p. 118 *et seq.* and notes; 3 Phillips on Evidence (4th am. ed.), pp. 6 to 112 and notes; 1 Greenleaf on Evidence (15th ed.); secs. 416, 417 and citations; Matthews vs. Haydon, 2 Esp. 509; Adams vs. Davis, 3 Esp. 48; Barker vs. Macrae, 3 Camp. 144; Ilderton vs. Atkinson, 7 Term, 480; Strafford Bank vs. Cornell, 1 N. H. 192; Phelps vs. Hall, 2 Tyler (Vt.), 399; Phillips vs. Bridge, 11 Mass. 242; Franklin Bank vs. Freeman, 16 Pick. 535; United States Bank vs. Stearns, 15 Wend. 314; Van Nuys vs. Terhune, 3 Johns. Cas. 82, and cases in note; Stewart vs. Kip, 5 Johns. 256. Applying these well-established principles to the case of the witness Hugh A. Corley, was he disqualified as a witness to testify in this cause to transactions of the kind inquired about between himself and John S. Adams, deceased? We do not think that he was disqualified. He was not a party to the suit directly or indirectly, and did not have that present, certain, and vested interest in its immediate result that was necessary to disqualify him; neither do we think that the record in this cause, no matter how it may have resulted, could have been used as evidence for or against him in any other cause. It is contended that he was interested in

establishing the defense interposed by the defendants as it would relieve him from liability to the defendants as trustees for the coupons turned over to Adams by him. It may have been true that he was interested in establishing the abstract fact that he had turned over to Adams the amount of coupons that he testified that he had delivered to him, but the establishment of that fact in this suit, no matter how it resulted, could not have had the direct effect of relieving the witness from further liability to account in another suit to the defendant trustees for the coupons so testified to have been delivered; neither could the record in this cause, no matter what its result, have been used by the witness in any suit against him by the trustees as an adjudication or establishment of the fact of such delivery or coupons by him; nor, had this suit resulted against the trustees, could the record therein be used against the witness, in a suit for such an accounting by the trustees, as an adjudication or establishment of the fact that he had not delivered to Adams the coupons he claims to have turned over to him. An interest by the witness simply in the *question* involved did not disqualify, but he must have been so interested in the *result* of the suit as that he would gain or lose directly and immediately thereby, or that the record therein could be used as legal evidence either for him or against him in some other suit as an establishment or disestablishment of the matters testified about by him. 1 Greenleaf on Evidence, sec. 389, and New York cases *supra*. Even if the witness Corley, however, was so interested in the event of this suit as that he would ordinarily be incompetent to testify in response to the interrogatories propounded to him and objected to, yet we think that in the transac-

tion between him and the deceased Adams, by which he turned over to the latter the coupons in dispute, he acted in the capacity of an *agent* for the defendant trustees, who were his principals, which put him clearly in the class of exceptions to the general rule who are not disqualified. The fact is undisputed that the witness Corley, prior to the alleged delivery of the coupons to Adams, had been the secretary, treasurer and land salesman for the defendant Board of Trustees, that as such agent of the Board he received large amounts of such coupons in payment for lands held in trust and for sale by said Board; that after J. S. Adams became secretary and treasurer for the Board he was expressly authorized to settle with Corley the affairs of the office while filled by the latter. Corley's testimony is that he held the coupons turned over to Adams as the property of the defendant Board of Trustees, and turned them over to Adams as the property of the Board. Under these circumstances he was nothing more than the agent of the Board in such transaction and entirely competent to testify in relation thereto. It is further contended here that the defendant Board of Trustees derived their right, title, interest or claim to the coupons, if any, through the witness Corley by transfer or assignment from him, and that therefore Corley was expressly disqualified by the statute as a witness to this transaction with the deceased Adams. This position is wholly untenable. Corley, the proof all shows, never had any other interest in, possession of, or ownership over, the coupons alleged to have been delivered by him to Adams than that of the custodian thereof *as agent* for the Board of Trustees. The trustees derived their title thereto, not from Corley, their agent, but directly from

the purchasers of lands held in trust and for sale by them, in payment for such lands. Corley had no interest either in the lands sold, or in the moneys or coupons received in payment therefor. In selling the lands controlled by the Board he acted merely as their agent, and in the receipt of coupons in payment therefor he acted in the same capacity. Whenever he received any moneys or coupons in payment for lands of the Board he did not acquire any interest in, or title to, such moneys or coupons, but received them as the property of the Board merely as their receiving agent. For a case where the witness offered and held competent was surrounded by circumstances quite analogous to that of the witness Corley, so far as interest in the event of the suit is concerned, see Nearpass vs. Gilman, 104 N. Y. 508, 10 N. E. Rep. 894.

The witness, Hugh A. Corley, after testifying that he had turned over to J. S. Adams coupons of the bonds of several of the railroad companies that had been received by him as treasurer of the Board, the interest on which was guaranteed by the Trustees of the Internal Improvement Fund, and that the coupons so turned over were in separate packages, then stated that he had kept a copy of the account that he presented containing a list of the vouchers; that such copy was in his own hand-writing, and that by refreshing his memory from it he could state the coupons turned over to Mr. Adams. The complainant's counsel objected on the ground that the witness read from such memorandum or paper, and was not testifying from his knowledge. This objection was overruled by the court in the 11th paragraph of the final decree, and the use made by the witness of the memorandum or copy of account to refresh his memory was sanc-

tioned and sustained. This ruling is also assigned as error. There was no error here. It is well-settled that witnesses are permitted to refresh and assist their memory by the use of written instruments, memoranda, or entries in books made contemporaneously with the transactions to which they relate. Not only are they *permitted* to do so, but if the writing is present in court, they may be *compelled* to do so. 1 Greenleaf on Evidence, secs. 436, 437 and citations. There was no objection to the form or nature of the memorandum used.

The witness, Hugh A. Corley, identified the following letter as being in the hand-writing of J. S. Adams, and signed by Adams, addressed to him (Corley) while he was acting for Adams as his clerk:

"JACKSONVILLE, March 23d, 1872.
H. A. Corley, Esqr.

DEAR SIR: Upon my accession to office I received of Treasurer Conover a large amount of coupons paid in by W. H. Gleason for lands, of which $6,378.71 were in excess of lands received, and of course stands to his credit. Please, therefore, open an account with him, giving him the $6,378.71 credit, and charging him lands conveyed to him or order accordingly. And I have his order to allow Mr. J. Taylor (in Land Office) to enter lands on his (G's) account on payment to me of 84 cents per acre for his use. Allow him, therefore, to enter on such payment to you for me.

Yours truly,
J. S. ADAMS, Comr."

The defendant offered the same in evidence, but it was objected to by the complainant on the ground of irrelevancy, but the objection was overruled in the 12th paragraph of the final decree, and this ruling is

assigned as error. There was no error in this ruling. The gist of the defense interposed to this suit is, that J. S. Adams, while Commissioner of Lands and Immigration, and *ex officio* a member of the Board of Trustees of the Internal Improvement Fund, and as Secretary and Treasurer of such Board, received large amounts of such coupons as are sued for herein, in his official capacity for the Board, and as its property. That the coupons sued for by his administrator were thus received by him, together with divers other amounts of coupons of the same kind, and that when found among his effects subsequent to his death, they were not his property, but the property of the defendant Board of Trustees. The letter objected to and admitted in evidence tended to prove one phase of the defense, *viz:* the receipt by Adams officially of large amounts of coupons, and, in this respect, was relevant to the issues and properly admitted.

The witness, Hugh A. Corley, also testified that in accordance with the constructions from Mr. Adams contained in that letter he, as Adams' clerk, did open and keep an account in a book in the office, giving Mr. Gleason credit for the amount of the coupons stated in the letter from Adams, and charging him with such entries of lands as he made. The book in which this Gleason account was kept was then produced and duly identified by the witness, who stated that the entries therein were correct and made at the time that they purport to have been. The defendants then offered in evidence the account as stated in said book, but it was objected to by the complainant as being irrelevant, the court overruled the objection in the 13th paragraph of the final decree, and this ruling is assigned as error. There was no error here. The ac-

Adams, Admr., v. Board of Trustees I. I. Fund.—Opinion of Court.

count tended to establish the same fact as did the letter last above discussed and, for the same reason, was relevant to the issues, and was properly admitted.

L. B. Wombwell, the Commissioner of Agriculture, was introduced as a witness for the defense, and produced from the records of his office of which he was the legal custodian, the following record books, *viz:* A stub-book with treasurer's receipts attached showing land entries from April 1st, 1871, entry No. 7023, to February 5th, 1873, No. 6358 inclusive. The witness explained, in reference to this stub-book, and the method of keeping the accounts of the salesman of land, that when any one buys land he is given a certificate, and the treasurer is given a certificate describing the lands, together with the money received for same, the treasurer's receipt is returned to the salesman and pasted in the stub-book opposite the stub on which the entry is made, and that this was the only voucher that the salesman had. The witness also produced the original register of entries of swamp lands made in his office of the lands of the Internal Improvement Fund showing entries or purchases of said lands from January 3d, 1871, No. 6082, to February 5th, 1873, No. 6358 inclusive; also another register of entries of lands belonging to the Internal Improvement Fund from January 2d, 1871, No. 6081, to December 2d, 1872, No. 6336 inclusive. All of these records were offered in evidence by the defendants, but were objected to by the complainant upon the ground of irrelevancy. The objections thereto were overruled by the court in the 14th paragraph of the final decree, and this ruling is assigned as error. There was no error in this ruling. It became material to the establishment of the defense interposed by the de-

fendants to show that J. S. Adams, among whose ef-
fects the coupons sued for were found, had in his pos-
session large amounts of such coupons that he re-
ceived from time to time in payment for the lands of
the defendant trustees, while acting as their treasurer
and salesman, for which he had never accounted. The
complainant, in order to meet this contention, offered
in evidence the minutes of the Board of Trustees of
April 2d, 1872, and June 20th, 1872, as evidence of the
fact, as there recorded, that J. S. Adams had resigned
the office of treasurer of the Board on April 2d, 1872,
and had then rendered his accounts to the Board of
his receipts as treasurer, which account had been then
audited and approved, and that, therefore, he had
turned over to his successor all moneys and coupons
on that date that he held for the Board. The stub-
book and registers of land entries objected to tend
strongly to rebut the complainant's claim that J. S.
Adams had settled and accounted fully on April 2d,
1872, since they show that he acted as salesman for
the Board long subsequent to that date, to-wit: down
to and including January 25th, 1873, and that between
the latter date and April 2d, 1872, when he had the
settlement, he made a large number of sales of land
for the Board, receiving therefor money and coupons
such as are sued for, and there is no definite proof
that he ever settled or accounted for the entries so
made. The evidence objected to was entirely relevant,
and the court very properly admitted it.

The 15th and last paragraph of the final decree that
dismisses the complainant's bill and adjudges him to
the payment of the costs of the suit is also assigned
as error. The complainant contends that the coupons
in suit having been found among the effects of his

testator, John S. Adams, after his death, that the presumption arising from such possession is that he was the owner thereof. That possession of personal property is evidence of ownership thereof by the possessor, and that the defendants have shown nothing to overcome this presumption. The possession of personal property raises a presumption of title in, and ownership of, the property by the possessor. Lawson on Presumptive Evidence, 420 and cases cited; 1 Greenleaf on Evidence (15th ed.) sec. 34. But this presumption of ownership from possession arises only when the *character* of the possession is unexplained; when the possession and nothing more is shown. If the possession is shown to be equally consistent with an outstanding ownership in a third person, as with a title in the possessor, the presumption is rebutted. It is said to be the lowest species of evidence, and liable to be overcome by any evidence showing the character of the possession, and that it is not necessarily as owner. Rawley vs. Brown, 71 N. Y. 85. The proof shows that the complainant's testator, John S. Adams, died testate on April 23d, 1876; that his widow qualified as his executrix and acted as such until June 5th, 1878, when she died, and within a month thereafter John S. Driggs was appointed administrator *de bonis non cum testamento annexo* of his estate, and that he acted as such until the 5th of June, 1885, when he was removed for failure to give additional bond ordered by the probate court, and on June 6th, 1885, the complainant was appointed administrator *de bonis non* of said estate in his place. That soon after Driggs' appointment as administrator he received from a sister of the deceased J. S. Adams a tin box, and that therein he found the coupons in question, with

300 SUPREME COURT.

Adams, Admr., v. Board of Trustees I. I. Fund.—Opinion of Court.

other effects in the nature of letters. That Driggs had been in the employ of J. S. Adams in his lifetime as deputy collector of customs, through which connection, Driggs swears, he became acquainted with the fact that Adams had been secretary of the defendant Board of Trustees; that when the coupons were found in the tin box they were done up in separate packages, and that when they were turned over to Gwynn, the State Treasurer, by Driggs they were kept as they were found, in separate packages, and Gwynn gave a separate receipt for each package; that no demand was ever made upon the defendant trustees for the payment of any of the coupons, either by the executrix of J. S. Adams, or by Driggs, her successor in the representation of the estate; but, on the contrary, that about the 26th of May, 1879, three years after J. S. Adams' death, while Walter Gwynn, who was then State Treasurer, and *ex officio* a member of the defendant Board of Trustees, was on a visit to Jacksonville, where Driggs resided, Driggs met him on the streets, and after passing him by, hailed him and remarked to him that he had something that he (Gwynn) ought to have in the treasurer's office, and upon being asked by Gwynn what it was, mentioned the coupons in suit, and asked Gwynn if he would receive them. Upon Gwynn's telling him that he would receive them, the next morning was appointed for another meeting, at which time they met and Driggs voluntarily, and without any assertion of title to or interest in the coupons as administrator of J. S. Adams, or otherwise, delivered them over to Gwynn, without condition or reservation, taking Gwynn's six several unconditioned receipts therefor as Treasurer of the Internal Improvement Fund. The six receipts given by Gwynn

were endorsed upon six several tabulated schedules showing the number of coupons, their amounts, dates, when payable, the bonds they were from, etc., each schedule and receipt representing the different packages of coupons as they were originally found by Driggs in the tin box. Upon one of these receipted schedules of coupons of the bonds of the Tallahassee Railroad Company, showing coupons amounting to $3,272.50, Driggs, before, said schedule was receipted by Gwynn, made the following memorandum, that he swears was copied by him from an endorsement found on the envelope that contained that batch of coupons in said tin box, *viz:* "In envelope·endorsed No. 48, $3,272.50 in coupons Tallahassee R. R. Co., paid June 29, 1868, and for which the Trustees of the I. I. Fund are entitled in stock in said Co." Gwynn, after receiving the coupons, took them to his office at the State capital and there deposited them, turning them over to his successor in office along with the other public properties of the office, taking his successor's receipt therefor. No demand for payment of said coupons, nor any claim of ownership thereof, was ever made, set up, or pretended, until about the 17th of April, 1889, ten years after they had been delivered up voluntarily and unconditionally to the trustees, when the complainant herein, as the · successor of Driggs in the administration of said estate, filed a petition with the defendant Board of Trustees demanding payment thereof, after, as he says, he had found Gwynn's receipts therefor in a box, and after he had concluded that they "*might be*"' of value. After the refusal of the defendants to recognize his claim thereto, the complainant instituted his suit on July 23d, 1890.

There is no proof, other than the bare finding of these coupons among the effects of the deceased J. S. Adams, that he was the owner thereof, or that he ever owned or dealt in any such property on his own account. On the other hand, to overcome the presumption arising from his possession thereof, it was shown that for several years J. S. Adams acted in the official capacity of secretary and treasurer for the defendant Board of Trustees, and subsequently as its salesman of its lands. That such coupons were receivable in payment for the lands held by the Board, and that while acting for the Board he received large amounts of such coupons for the Board in payment for its lands, and for which there is no evidence of any complete settlement or accounting by him. It was further shown that Hugh A. Corley, a former secretary, treasurer and salesman of the Board, in a settlement of his accounts had with Adams, by authority of the Board, turned over to the latter for the Board, and as its property, a large amount of the same character of coupons, lacking only a few hundred dollars of being the exact amount sued for, and there is no evidence that J. S. Adams ever reported or accounted for the coupons thus received. Corley turned over to J. S. Adams in this settlement *five* packages of coupons, numbered and identified as follows:

No. 48, Coupons Tallahassee Railroad Company............................................. $ 140.00
No. 49, Coupons Tallahassee Railroad Company............................................. 3,272.50
No. 50, Coupons Tallahassee Railroad Company............................................. 714.00
No. 51, Pensacola & Georgia Railroad Company............................................. 1,816.50
No. 52, F., A. & G. C. R. R. Co............. 3,955.00

Among the packages found in the Adams tin box and turned over by his anministrator to the defendants, *as their property*, and receipted for by Treasurer Gwynn, we find *one* package of coupons of the Tallahassee Railroad Company amounting to $854, that it will be perceived corresponds exactly in amount with the aggregate amount of *two* of the packages of coupons of the same road turned over by Corley—No. 48 for $140, and No. 50 for $714: $854. Another one of the packages turned over to Gwynn and receipted for separately by him contained $3,272.50 of coupons of the Tallahassee Railroad Company, and upon the envelope in which they were found among J. S. Adams' effects was endorsed the memorandum, above given, to the effect that they were the property of the Internal Improvement Fund. It will be perceived that this• package corresponds exactly in amount and in the name of the railroad whose coupons it contained, with another of the packages turned over by Corley to J. S. Adams. Still another of the packages turned over by Driggs to Gwynn and receipted for separately by the latter contained $1,816.50 of the coupons of the Pensacola & Georgia Railroad Company's bonds. Corley, it appears, turned over to J. S. Adams one package of that company's coupons corresponding with it exactly in amount. ˙ Besides these H. A. Corley turned over to J. S. Adams a large amount of coupons of the Florida, Atlantic & Gulf Central Railroad Company's bonds, and we find in the Adams tin box a large amount of the coupons of that railroad also, that were likewise turned over by his administrator to Treasurer Gwynn.

The proofs further show that during the life-time of J. S. Adams the affairs of the trust presided over by

the defendant Board of Trustees were put into the hands of a receiver in litigation in the Federal Courts, and that by decrees of that court the receiver appointed advertised for the presentation for payment of all coupons held as a charge upon such trust fund. J. S. Adams, though a party to that litigation, never presented or made any claim for any of the coupons involved in this suit, and yet the proof shows that he had need for all of his monetary resources, as his estate was found to be heavily involved in debt upon his death; his homestead even being mortgaged and subsequently sold for the mortgage debt. In view of all these circumstances, we are of the opinion that the presumption of ownership by J. S. Adams' estate of these coupons arising from the bare fact of their being found among his effects after his death, is more than rebutted. The accurate correspondence of the different packages in which the major part of them were found in the tin box, with the packages that had been turned over by Hugh A. Corley to John S. Adams, coupled with the fact that Adams never made any report of or accounting for the Corley coupons, and with the further fact that one of the largest packages so corresponding with the Corley packages had endorsed upon it when found a memorandum showing that it was the property of the defendant trustees, is convincing proof to our minds that the major part of the coupons sued for are the identical ones turned over, as the property of the trustees, to Adams by Corley. This being true, it having been shown that he had, besides, at different times during his official life, other large amounts of similar coupons, belonging likewise to the defendant trustees, and for which, like them, there has been no accounting, it is fair to

presume that *all* of the coupons found together in the tin box were held by him in the same capacity, as agent for the defendant trustees, else he would not thus have kept his own individual property together with the property in his hands as agent.

It is contended here on behalf of the appellees that the coupons sued for, in consequence of the manner in which they were delivered by the administrator Driggs to Treasurer Gwynn, were *administered* assets of the estate of Adams, if of the estate at all, and that the complainant, as the successor of Driggs in the administration, had no right or authority to sue for or recover the same. In the case of Gregory vs. Harrison, 4 Fla. 56, where the whole subject of the rights and status of an administrator *de bonis non* is ably and exhaustively discussed, the word *"adminiter"* is defined to be equivalent to "alter, change, or convert," and that the change or alteration of the goods necessary to amount to an administration, is not a change *in specie*, but a change *in the property of the goods.* While John S. Driggs, as a witness in the cause, did not deny that he had delivered these coupons to Treasurer Gwynn voluntarily of his own motion, and unconditionally without reservation, but with the remark that, "they ought to be in the Treasurer's office," and though he does not claim to have requested Gwynn to investigate or ascertain from the records in his office whether said coupons belonged to the trustees or not, and that if found not to belong to them, that they should be returned to him, yet he did swear that, he had "come to the conclusion in his own mind, perhaps with consultation with some parties, that if the coupons belonged to the State, that he

should turn them over to the succeeding officer of Mr. Adams, who, of course, I supposed, if they were charged against him or his estate in any way, they would credit him with it, or if they did not belong to him, or were Mr. Adams' private personal property, they would get back in time to the estate." With this proof, even though Driggs at the time of the delivery to Gwynn did not disclose any mental doubt to be solved as to the ownership of the coupons, we do not think that the passing of them over to Gwynn was such a change *in the property* therein as would have amounted to an *administration* of them by Driggs so as to put them beyond the reach or control of his successor in the administration, had the estate been otherwise shown to be entitled to them.

Other questions, such as the bar of the statute of limitations, and laches on the part of the complainant, have been presented, but from the conclusions reached on the facts of the case, it becomes unnecessary to pass upon or discuss them. Our conclusion is that the preponderance of the proofs admitted abundantly establishes the defense interposed, that the coupons sued for are the property of the defendant Board of Trustees, and were never the property of the estate of J. S. Adams, deceased.

Subsequently to the entry of the appeal from the final decree just disposed of the complainant applied by petition to the chancellor below for a rehearing of said cause, chiefly upon the ground of newly discovered evidence. The court below denied the application, and a separate entry of appeal was made from such order of denial. Without sanctioning the practice of making applications to the court below for vacation of decrees and the granting of rehearings

thereon after such applicant has regularly taken and entered an appeal from the same decree to this court, we find the application for rehearing here made entirely without merit, and far short of the requirements in such cases. There is no averment therein that any definite evidence has been discovered by the applicant since the hearing, but instead, he asserts vaguely that he has discovered some sources from which evidence can be derived. The application fails to show the required diligence on the part of the applicant, and the evidence hinted at is cumulative.

The decrees appealed from are affirmed.