THE ATLANTIC COAST LINE RAILROAD COMPANY, A
CORPORATION DOING BUSINESS IN THE STATE OF
FLORIDA, *Plaintiff in Error*, v. CARRIE D. MAL-
LARD, *Defendant in Error.*

1.  In an action by the widow of a deceased locomotive engineer
    against the railroad company in whose employment he was
    at the time of his death, to recover damages for his death,
    alleged to have been caused by the negligence of the railroad
    company, and where the issues made by the pleas were that
    the engineer was killed by running his engine into the rear
    of a passenger train standing in the limits of a *railroad yard,*
    where it was his duty to take precautions for the protection of
    his own train, which duty was well known to the engineer,
    but which he negligently failed to observe, but heedlessly and
    recklessly ran into the train standing on the track on the
    main line at a place where and a time when he had reason-
    able cause to believe that standing trains would be encoun-
    tered, which negligence caused or contributed to his death,
    it was erroneous on the trial to deny the railroad company the
    right to prove that the engineer was killed under the circum-
    stances alleged in the pleas, because the "yard limits" were
    not defined with sign boards marked "Yard limits," in ac-
    cordance with a rule of the railroad company that such yard
    limits would be so defined, as by such a ruling the case was
    tried on an issue not made by the pleadings.

2.  A railroad yard as a matter of fact is a place where cars and
    trains are deposited and switched from one track to another,
    and trains are made up, and it consists of the various tracks,
    switches and other facilities used for such purposes, the
    actual limits and boundaries of which may, or may not, be
    well known to the employes who use it. Where a rule of a
    railroad company states that yard limits would be defined
    by sign boards, marked "Yard limits," it may under certain
    circumstances be negligence in such company not to so define
    them, and if one is injured in consequence of such negligence
    it may afford the basis for an action for damages.

3.  Where special pleas set up new matter in defense, and there
    is a joinder of issue thereon, such joinder creates an issue as

to the truth of the new matter, but does not furnish the basis for avoiding the effects of the new matter by other matter.

4. In an action for damages brought by the widow of a deceased locomotive engineer against the railroad corporation in whose employment he was at the time of his death for the negligent killing of her husband, the agents and employees of the corporation are competent witnesses as to transactions with the deceased engineer relevant to the issues. Declarations and admissions of the deceased engineer not a part of the *res gestae*, are excluded by the rule laid down in Jacksonville Electric Co., v. Sloan, 52 Fla., 257. 42 South. Rep. 516.

This case was decided by Division B.

Writ of Error to the Circuit Court for Alachua County.

The facts in the case are stated in the opinion of the court.

*R. A. Burford* and *Carter & Layton,* for plaintiff in error;

*W. W. Hampton* and *A. H. King,* for defendant in error.

HOCKER, J.—In July, 1906, Carrie D. Mallard, the defendant in error, hereinafter called the plaintiff, sued The Atlantic Coast Line Railroad Company, the plaintiff in error, hereinafter called the defendant, in the Circuit Court of Alachua county for damages on account of the death of her husband William H. Mallard, the suit being brought under Sections 3145 and 3146 of the General Statutes of 1906. On the trial she was given a verdict for $32,000.00, and judgment was entered thereon. From this judgment a writ of error was sued out from this court.

The two counts of the declaration on which the case was tried are as follows: "Carrie D. Mallard, widow of William H. Mallard, deceased, hereinafter mentioned, by A. H. King, her attorney at law, sues the defendant, Atlantic Coast Line Railroad Company, a corporation doing business in the state of Florida, in an action of trespass on the case, for this, to-wit: That before and during the time herein set forth, the defendant was, and still is a corporation doing business in the state of Florida, and owning, maintaining and operating a railroad line and system of railroads in the county of Alachua, state of Florida; that on the 2nd day of June, A. D. 1906, the said William H. Mallard, was employed by the defendant in the capacity of engineer, and on the same day being so employed the said William H. Mallard, was on one of the locomotives, to-wit: Locomotive No. 249 of the defendant company, then and there attached to a train of cars operated by the defendant; and while on said locomotive about four o'clock A. M. on said day, near the town of Newberry, and west thereof, in the county of Alachua, and state of Florida, the said William H. Mallard was engaged in the performance of his duties as engineer, and while so engaged said train was being run on the main line of defendant from the 'Y' below and west of the said town of Newberry, eastward near the said town of Newberry, until the said train arrived at a point where a sharp curve ends on a steep down grade, on said main line; that at this point and to-wit: one hundred feet eastward from said curve in the middle of such steep down grade, the defendant had left a passenger train, lying on said main line, where it was impossible, under the circumstances, for the engineer then in his place on said locomotive, to see the said obstruction on said track and line far enough ahead to stop the train of cars aforesaid, descending said grade, before reaching the train of cars left

10—Vol. 54

on said main line, that while said train of cars was descending the grade as aforesaid, there appeared for the first time to the fireman on said engine, within the distance of to-wit: two car lengths, said passenger train, which had not up to that time appeared to the said William H. Mallard, by reason of the track conditions aforesaid, and in front thereof a freight train of to-wit: 20 cars in length, upon said main line, at a stand-still; that the defendant had carelessly and negligently left its said train of cars upon said track, and before the said William H. Mallard in the exercise of due care and caution could stop the train of cars upon which he was engineer or save himself, the said train came into collision with the said passenger coach of defendant, and then and thereby the said William H. Mallard was crushed against and upon the boiler of said locomotive, and by reason of said collision, the said William H. Mallard was so wounded, bruised, broken and crushed, that he departed this life on said day killed by the defendant, wherefore, a cause of action has accrued to this plaintiff, the widow of the said William H. Mallard, deceased, against the defendant, wherefore, plaintiff sues the defendant, and claims fifty thousand dollars damages.

And for a second count, the plaintiff avers all the averments of the first count, and further says, the said passenger coach and train had been carelessly and negligently left lying upon the said track by the defendant, and that there was no warning, signal or notice of any kind given of the presence of the said coach and train, so left lying upon the main line of the defendant, and there was no guard, flagman, or other person, or any signal or warning, then and there provided, to give notice, nor was any notice or warning given of the presence and position of such coach, train or trains of cars so lying upon said main line of defendant; and the

plaintiff says the defendant negligently and carelessly left its said coach and train so lying upon its said main line without signals, warning or guard of any kind to indicate their presence, and that by reason of the carelessness and negligence aforesaid of the defendant, the said locomotive came into collision with said passenger coach, and the said William H. Mallard in the exercise of due care and caution, was then and thereby caught, pinioned, held and crushed against and upon the boiler of said locomotive, and was then and thereby so bruised, lacerated, broken and torn, in and throughout his abdominal regions and groin, and in and upon his head, that the said William H. Mallard on said day departed this life, killed by the defendant, whereby a cause of action has accrued to this plaintiff, the widow of the said William H. Mallard, deceased, against the defendant, wherefore, plaintiff sues the defendant, and claims fifty thousand dollars damages."

To these counts the defendant filed, first a plea of not guilty, and, second, a plea that Mallard's death was caused by his own carelessness and negligence, and not by any alleged carelessness or negligence on the part of defendant, and the following special pleas:

"3. And for a third and further plea to the first and second counts of plaintiff's declaration this defendant says that said William H. Mallard was, at the time of the alleged homicide, the engineer in charge of engine known and designated as 249, which engine, with a train of cars attached and in charge of the said Mallard as engineer, was run as an extra train from Jacksonville, Florida, to Newberry, Florida, on the first day of June, 1906. On arrival at Newberry on said date, the first day of June, 1906, it became necessary for said extra freight train, drawn by engine 249 as aforesaid, to make use of the 'Y' at Newberry, in order for the said engine and such cars as it was then and there drawing, to turn

its course and be again headed for Jacksonville over the line of defendant's road running between Jacksonville and Newberry as aforesaid, in order that the said engine, with such cars as might be attached thereto, might leave Newberry on the morning of the second day of June, 1906, on the return trip from Newberry to Jacksonville. After the cars drawn by engine 249 had been run into said 'Y' track, and the turn made on said 'Y', said Mallard, as engineer in charge thereof, on the evening of said day of June first, 1906, moved said engine and cars attached to a point on the main line of the Jacksonville & Southwestern Railroad track, then and now owned and controlled by the defendant, near the old depot on said line, and west of the crossing of said line with what was formerly known as the line of the Savannah, Florida and Western Railroad, which said line of road was then and is now owned and controlled by this defendant; and at or near said point of location of the old Jacksonville and Southwestern depot, the said engineer Mallard left his engine and train standing 'tied up' for the night. Between the time that said engine and cars were left standing on said main line as aforesaid, and before the time for departure on the return trip to Jacksonville, on the following day, it became necessary for another train of the defendant, in the ordinary conduct of defendant's business at said town of Newberry, to enter said main line, and to accomplish this, the said train, in order that it might enter upon said main line, backed the said engine 249, with the cars attached, to a point westward on said main line track into the 'Y,' and there the said engine 249 with the cars attached, remained until the following morning. The location of the 'Y' and of the other tracks of the defendant from the point where engineer Mallard moved his train from the 'Y' to the main track, leading to Jacksonville on the morning of the following day, to-wit: June 2nd, 1906,

up to and beyond the point where the collision occurred, is within the yard limits at Newberry, which fact was well known to the said Mallard while operating his said engine and cars between said 'Y' and the point where the collision occurred, and beyond said point to the crossing of said railroad tracks, within which limits it was the duty of the said Mallard to look out for and afford protection to his own train running at such a rate of speed and to so handle the same as to render it easily and completely under control, which fact and duty was well known to the said Mallard. And the defendant says that notwithstanding this said duty, well known to the said Mallard as aforesaid, he, the said Mallard, moved out from the 'Y,' on to the main line, and ran his train of cars at such a rate of speed, and without making air brake couplings or connections, with which said train of cars was provided, and thus failed to have said train under easy and proper control, and in so doing the said engineer Mallard was guilty of negligence which either caused or contributed to the injuries resulting in his death.

"4. And for a fourth and further plea to the plaintiff's first and second counts of the declaration, the defendant says and avers all the averments of the third plea, and further says that the said engineer Mallard failed to take any precautions to protect his own train, as it was his duty so to do, but heedlessly and recklessly ran into a standing train upon the main line at a place where and at a time when, the said engineer Mallard did have reasonable cause to believe that standing trains, cars, or other obstructions would be encountered, and in so doing, the engineer Mallard was guilty of negligence which either caused or contributed to the injuries resulting in his death, and this, the defendant is ready to verify."

Issue was joined on these pleas and on these issues

the case was tried.    The facts show that on June 2nd, 1906, the defendant owned and operated a line of railroad running from South Florida in a northerly direction, formerly known as part of the Savannah, Florida & Western Railroad, through the town of Newberry in Alachua county; and also owned and operated a line of railroad from the city of Jacksonville, in Duval county, through the town of Newberry, and terminating at a place called Tyler, about seven miles southwest of Newberry.    This road was formerly known as The Jacksonville & Southwestern.    This last road crossed the track of the former at Newberry.

On the 1st of June, 1906, William H. Mallard was a locomotive engineer in the employ of the defendant, and on that day came out from Jacksonville to Newberry on the line of the Jacksonville & Southwestern on an extra train, in charge of engine designated as 249. It appears that he arrived at Newberry somewhere about noon, and the rest of the day he spent in switching, removing and placing cars on the various tracks around the vicinity of the depot, as his train had merchandise for the north, south, and for Newberry, and had worked every track in Newberry.    When the switching was done, the train and engine were left tied up for the night on the main line near where the accident occurred in which Mallard was killed.    During the night another train came in, and having occasion to use the main line track backed this train out on to a Y about a mile from the depot.    The crew were asleep at the time, and when they awoke in the morning they found the train on the Y.    In the morning engineer Mallard waked up the conductor Perry, telling the conductor he would be ready to move off as soon as he got up steam.    The conductor told him "all right."    When the engine was ready Mallard blew three times, a signal for backing up.    The conductor had the switch opened and let the train out of

the Y. There was a sharp curve and deep cut and a steep grade between the Y and the depot, where the conductor expected to make up his train and get his orders. His train then contained six or seven box cars loaded with lumber, and perhaps some flat cars. The passenger train which was being made up to leave for Jacksonville, with some freight cars, constituting quite a lengthy train was lying on the main track, between the Y and the depot. The end of this train was near the bottom of the curve and descent from the Y, and was perhaps not actually seen by Mallard until he was quite near it, coming down at the rate of from three to five miles an hour. His engine struck the rear passenger coach, not doing it very serious injury, but the weight and momentum of his own train drove the tender onto the engine, mashing Mallard, and giving him injuries from which he died in a few moments.

It was the custom to transfer cars at Newberry coming from the south and destined for Jacksonville, and *vice versa*. There were one or more regular trains running from Jacksonville to Newberry, and back again. These trains were turned around and made up at Newberry. Extra trains were run between the same points. There was one regular train between Jacksonville and Tyler. Some of the plaintiff's witnesses say that it was customary to leave passenger trains standing over night on the main line near the depot (on the J. & S. W. as we understand it).

The plaintiff introduced in evidence over the objection of the defendant, several rules or regulations of the defendant company, *viz*:

"99. When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled he may return to his train, first placing

two torpedoes on the rail, *and planting a lighted fuse on the track,* when the conditions require it.    The front of a train must be protected in the same way, when necessary, by the fireman.

99 (a).    When the speed of a train is reduced, and its rear thereby endangered by a following train before the flagman can get off, a lighted fuse must be thrown upon the track at intervals until the flagman can get back to protect his train.    When a train is to back out of a siding, the flagman must go a sufficient distance to the rear to insure full protection.

886.    It is their special duty to protect the rear of their trains in accordance with the rules, and they must allow nothing to interfere with the prompt and efficient discharge of this duty.

873.    They must closely observe other trains and act promptly in the protection of their trains when necessary to do so.

105.    Yard limits at Jacksonville, Palatka, DeLand Junction, Sanford, Oviedo, Orlando, Kissimmee, Lakeland, Winston, Ybor City, Tampa, Port Tampa, Bartow, Punta Gorda, Fort Myers, High Springs, DuPont, Live Oak, Fort White, Gainesville, Rochelle, Ocala, Leesburg, Croom, Juliette, Dunnellon, Inverness, Trilby and St. Augustine, Milldale, Lake Butler and Newberry, will be indicated by sign-boards marked 'yard limit.' · Engines have the right to work within the yard limits without special orders.    They must keep five minutes off the time of all regular trains, run carefully and lookout for extra trains.    Extra trains must approach and run through yard limits, carefully looking out for engines at work.    Yard limits are established 2,500 feet north of East Alachua, and extending 2,500 feet south of Burnett's Lake telegraph office, and 2,500 feet north of Burnett's Lake water tank on Newberry Branch, to a point 2,500 feet south of West Alachua.

All trains will reduce speed to four miles an hour through these limits, expecting to find other trains flagging in these limits."

The plaintiff also introduced the following definition of "yard" from the rule book of the defendant company, *viz*: "A system of tracks within defined limits provided for the making up of trains, storing of cars, and other purposes, over which movements not authorized by time-table or by train order, may be made, subject to prescribed signals and regulations." We think these rules were relevant testimony to the issues made.

The defendant put in evidence Rules 105, 106 and 928 from its Book of Rules as follows:

"105. Both conductors and engineers are responsible for the safety of their trains, and, under conditions not provided for by the rules, must take every precaution for their protection.

106. In all cases of doubt or uncertainty, the safe course must be taken, and no risks run.

928. They will obey orders of the conductor of the train, in regard to starting, stopping, shifting cars, speed, and general management of the train, unless they endanger the safety of the train or require violations of the rules."

The defendant undertook to prove by various witnesses and by various questions that as a matter of fact the system of tracks near to and around the depot at Newberry constituted what is known as a railroad "yard," for the switching and transfer of cars and trains from the Jacksonville and Southwestern division to Savannah, Florida & Western division, for making up trains and for other purposes for which railroad yards are used, and that consequently Mallard knew of these facts, or had opportunity to know them. These questions were either objected to by the plaintiff, and her objections were sustained, or the answers to such questions as were an-

swered were stricken out on motion of the plaintiff. These rulings of the court form the basis of a large number of assignments of error. The following are examples:  A witness,  O. T. Blitch was introduced by the defendant and testified that he was a train conductor with the defendant company on June 2nd, 1906, (the day of the death of Mallard) and had been such train conductor for three years. He testified that he knew Mallard who had pulled him a few trips; that the last trip before his death he was with the witness as engineer; that he also acted as engineer of trains under other conductors; that there are yards at Newberry; that it is customary whether there are yard boards there or not, from one switch to the other that it is known as Newberry Yards. The following question was asked the witness: "Please state what the yard limits are at Newberry, if you know, and how do you know." Ans. "The yard limits there were from one switch—from the side of S. F. & W. switch over to the 'Y', and all trains operated from the old S. F. & W. side to the 'Y', were orders." The plaintiff moved to strike the answer, because, first, it has not been shown legally that there have been any yard limits established and defined, in accordance with the rules of the company; second, the testimony contradicts the printed rules of the company; and, third, it has not been shown that the company has ever established any yard limits or defined them. This motion was granted.

The plaintiff also propounded the following question to the witness Blitch: Q.  Within what distance at Newberry, and between what points did the tracks lie which were used for storing cars over which movement is not authorized by time table, or by train order might be made." This question was objected to by the defendant "because counsel seeks by his question to establish and define what would be a yard limit indirectly, after

the court has ruled that the yard limits have not been proven to have been established and defined by the company." The objection was sustained. The following question was also asked this witness: "Q. Do you know what has been the course of business in storing and handling of trains at Newberry, and as to what has been uniformly and generally recognized by the conductors and engineers as constituting the yards at Newberry, since the acquisition by the Coast Line of the Jacksonville and Southwestern?" This question was objected to by the plaintiff because it seeks to establish a custom on the part of this defendant corporation, and it has already been shown by competent testimony that the defendant has printed rules and regulations declaring that the yard limits at this particular point will be indicated by sign boards marked "Yard Limits." 2nd. It cannot be shown by the testimony of the conductor of a railroad train that the yard limits have been established or have been defined by the defendant corporation. 3rd. The testimony is inadmissible, immaterial and wholly incompetent under the pleadings in this case." Plaintiff's objections were sustained to this question. The following question was asked this witness: "Q. State whether or not shortly prior to the date of the accident resulting in the death of Mr. Mallard you had any conversation with Mr. Mallard relating to his knowledge of the extent of the yards at Newberry." This question was objected to by the plaintiff, first, because it has not been shown that the yard limits have been established and defined by the defendant corporation as prescribed by its rules; second, because it seeks to elicit from the witness a conversation with the deceased, his lips being sealed by death, and this suit being a suit between the widow of the deceased and the railroad corporation, and it appearing that this witness is the agent and representative of that corporation he is disqualified to testify

under the statute, as to conversations had with the deceased." This objection was sustained.

The defendant in the course of the examination of one of its witnesses *viz*, W. H. Perry, propounded the following question: "Q. What train were you conductor on at that date (alluding to the date when Mallard was killed)? Ans. The day of the accident I was making up a train with engine 249 in the Newberry Yard. It was not a train at the time of the accident." This answer was objected to by the plaintiff, who moved to strike out the word "yard" at Newberry, because it had not been shown that there was any yard there. This motion was granted.

It is contended by the defendant in error in the brief of her attorneys and admitted by the plaintiff in error that the yard limits at Newberry had never been defined by the defendant corporation by the erection of sign boards marked "Yard Limits," embracing the place on the track where the death of Mallard occurred. Under these circumstances we are to determine whether the court below erred in ruling out the testimony offered by the defendant tending to show that there was as a matter of fact a railroad yard at Newberry, with limits defined by actual use of the various tracks and switches there and the Y west of the crossing, and that engineer Mallard knew of these facts, or ought to have known of them, for if these facts existed and Mallard knew of them, then the rules of the company with reference to his duties in taking precautions for the protection of his train applied, and the proffered testimony tended to support the defendant's pleas. In order to determine this question we must first determine the issues which were made by the pleadings. The negligence set up in the first count of the declaration is in substance, that the defendant had left a passenger train lying on the main line near the end of a curve on a steep grade where Mallard could not see

it and avoid a collision with it, and the negligence alleged in the second count is that the said train was left on the main line without signals, warning or guide of any kind to indicate its presence, and that it was because of these alleged acts of negligence that Mallard's engine collided with the passenger train and he was killed. To meet these alleged acts of negligence the defendant pleaded not guilty, and also special pleas in which it is in substance alleged that Mallard's train was an "extra" from Jacksonville to Newberry drawn by engine 249; that it was necessary for said train and engine to use the Y west of Newberry to turn around and head for Jacksonville; that the train was thus turned around and brought back by Mallard on the main track and then left tied up for the night of June 1st; that another train pushed his train and engine back during the night on to the left leg of the Y; that the location of the Y and other tracks of the defendant from the point where engineer Mallard moved his train from the Y to the main track leading to Jacksonville on the morning of June 2nd up to and beyond the point where the collision occurred is within the "yard limits" at Newberry which fact was well known to Mallard, within which limits it was the duty of Mallard to look out for and afford protection to his own train, and to so handle the same as to render it easily and completely under control, which duty was well known to Mallard, and that notwithstanding he ran his train out of the Y on to the main line at such a rate of speed without making air brake couplings or connections with which he was provided, and was thus guilty of negligence which caused or contributed to his death; and in addition the fourth plea further averred that Mallard failed to take any precautions to protect his own train as it was his duty to do, but heedlessly and recklessly ran into the train standing on the main line, at a place where, and at a time when, he had reasonable

cause to believe that standing trains or other obstructions would be encountered, and thus was guilty of negligence which caused or contributed to his death.

It will be observed that in neither the declaration or pleas was any issue *directly* made or presented whether the "yard limits" at Newberry had been indicated by sign boards marked "Yard Limits" in accordance with Rule 105. The plea alleged the existence of yard limits at Newberry as a fact, but does not allege that those limits were indicated by sign boards marked "Yard Limits."

It is thus seen that the circuit judge in excluding the proffered testimony of the defendant tending to show that there were "yard limits" at Newberry as a matter of fact, tried the case upon the theory of an issue which was not directly made by the pleadings, *viz*, that no yard limits could be proven in any other way than by sign boards marked "yard limits." It is established law in this state that a case must be tried upon the issues tendered and accepted. Clyde Steamship Co. v. Burrows, 36 Fla. 121, 18 South. Rep. 349; Parrish v. Pensacola & A. R. Co., 28 Fla. 251, 9 South. Rep. 696 (7th headnote). The plaintiff accepted the issues tendered by the defendant's pleas, by joining issue on them. This entitled the plaintiff to show if she could, that the *facts* set up in said pleas were not true, or to rebut the defendant's proof tending to support said pleas, for in the first instance the burden of sustaining the pleas was on the defendant. But we do not understand that she was entitled to avoid the effect of these pleas by proof of new matter—matter not alleged in the declaration and not set up in a replication or new assignment. Our statute, section 1447 General Statutes of 1906, prescribing the effect of a "joinder of issue," says that such joinder shall be deemed *a denial of the substance* of the plea or other subsequent pleading. Section 1453 General Statutes of 1906, prescribes the form of a joinder of issue, and also

the form of a replication to pleas containing new matter, and the form of a new assignment. These sections are taken from the Common Law Procedure Act of 1852. Day's Common Law Proc. Acts, pp. 113, 242. In the case of Green v. Sansom, 41 Fla. 94, 25 South. Rep. 332 this court had occasion to refer to the interpretation of these sections by the English Court in Glover v. Dixon, 9 Exch. 158. As we understand that case it was held that these sections do not do away with the necessity for a special replication or new assignment when it is desired to avoid the effect of new matter of defense set up in a plea. This is evident from the fact that the statute provides a form of replication to pleas containing *new* matter, and also the form of a new assignment. In the instant case the special pleas set up *new* matter in defense to the suit, and the joinder of issue thereon simply made an issue upon the truth of this new matter. It did not by its terms seek to avoid the effect of the new matter by any other new matter. For these reasons we think the court below erred in sustaining the objections to the defendant's testimony.

It may be also observed that the effect of these rulings was to permit the plaintiff to recover upon a ground of negligence not stated or relied on in the declaration, viz, the *failure to mark the yard limits with sign boards.* If the plaintiff intended to claim damages for this reason there should have been a count in the declaration to that effect. It is established law in this state that the negligence of a defendant affords no ground of action or recovery against him unless that negligence is alleged in the declaration and was a proximate cause of the damages sued for. The evidence proffered, taken in connection with that which was admitted, tended to show *as a matter of fact* that there was a railroad yard at Newberry when Mallard was killed, that it consisted of various tracks, switches, and a "Y," adjacent to depot grounds where

cars and trains were deposited and switched from one track to another, and trains were made up. Where these conditions exist the courts have considered them as constituting a railroad yard. Baltimore & O. S. W. Ry. Co. v. Little, 149 Ind. 167, text 173, 48 N. E. Rep. 862, and cases cited. There is nothing in the nature of things, and there is no statute, which forbids that such a yard may have its limits fixed in other ways than by sign boards marked "Yard Limits," so as to make such limits perfectly familiar to the servants and employes of a railroad company whose duties require them to use the yard. Doubtless it is prudent and proper to mark such limits with such sign boards, and it may be negligence in the company not to do so. But we are referred to no law and we know of none applicable to this state, which precludes a railroad from proving the actual *conditions* which constitute a railroad yard, and its *actual* limits, because it has failed to mark out the limits with sign boards as its rules provide shall be done. In some jurisdictions under what are called Employers Liability Acts, it may be that such omission and negligence would of itself create liability without regard to the question of proximate cause. 2 Labatt's Master and Servant, §§639 to 652a inclusive. But we have no such statute in this state, and here the rule is that the negligence sued on must be a proximate cause of the injury or damage. Florida Cent. & P. R. Co. v. Williams, 37 Fla. 406, 20 South. Rep. 558; Savannah, F. & W. R. Co. v. Cosens, 46 Fla. 237, 35 South. Rep. 398.

It is contended by the defendant in error that as Rule 105 showing that the yard limits at Newberry *would be defined by sign boards* marked "Yard Limits," makes such sign boards the best evidence of yard limits, and secondary evidence was under the circumstances improper. This would be a correct contention if the defendant had pleaded that the yard limits had been defined

in this way and according to this Rule (105). *But it did not so plead.*

One of the objections made by the plaintiff in the court below to evidence proffered by the defendant is that Mallard being dead, the employees of the defendant corporation could not testify as to conversations and transactions with him relative to his knowledge of conditions at Newberry. It is contended by the plaintiff here that the court did not sustain this particular objection, and that the proffered evidence was excluded on the ground that there were no yard limits at Newberry. The record does not show on what specific ground the plaintiff's objection was sustained. If it was done on the theory advanced here by the plaintiff we think it was erroneous for reasons already stated. But to avoid misapprehension in the future we deem it best to refer to the fact that this court has heretofore construed section 1505 General Statutes of 1906 (Chapter 1983, Laws of 1874) in the case of Adams, Adm'r. v. Board of Trustees of Internal Imp. Fund, 37 Fla. 266, 20 South. Rep. 266, and there held that the statute did not exclude the evidence of agents of every description by whom business was transacted, but that to be disqualified the witness "must be so interested in the result of the suit as that he would gain or lose directly and immediately thereby, or that the record therein could be used as legal evidence either for or against him in some other suit as an establishment or disestablishment of the matters testified about by him." This seems to settle the question that the employees of a corporation are not disqualified as witnesses for the corporation in a case like the instant one. It was held in Florida Cent. & P. R. Co. v. Mooney, 40 Fla. 17, 24 South. Rep. 148, that in actions for negligence any evidence tending to prove knowledge on the part of the person alleged to have been negligent, of those circumstances and surroundings which

11—Vol. 54

enter into the question as to whether such person has failed to exercise proper care is admissible;" and except as this doctrine is qualified in a suit brought like the present one by the widow of the deceased in the case of Jacksonville Electric Co. v. Sloan, 52 Fla. 257, 42 South. Rep. 516, we think it is applicable to the instant case. In the last mentioned case we held that the *declarations* and *admissions* of the deceased as to his physical condition shortly before his death, and not a part of the *res gestae* could not be proved in a suit for damages by the widow.   We understand this doctrine as resting on the rule that declarations and admissions, while hearsay evidence are admitted as being against the interest of the party who makes them, and who may be presumed not to have admitted anything against his interest, which was not true.   But where the widow sues for damages for the death of her husband under the statute it is not the husband's interests which would be affected by his admissions, but the widow's statutory interest, and therefore his admissions are hearsay and incompetent.

There are other assignments of error, but inasmuch as we think this case was tried on an incorrect theory of the issues made by the pleadings, and the assigned errors are probably referable to this incorrect theory, it is not likely they will occur again, and it is, therefore not necessary to give them extended notice.

The judgment of the circuit court is reversed and a new trial awarded.

TAYLOR and PARKHILL, JJ., concur;

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, JJ., concur in the opinion.